```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INTERNATIONAL CHEMICAL       )
WORKERS UNION COUNCIL        )
OF THE UNITED FOOD AND       )
COMMERCIAL WORKERS           )
UNION and its LOCALS 45C and )
776C,                        )
                             )
             Plaintiff,      )
                             )
        vs.                  )   Civil Action No. 01-1751
                             )
PPG INDUSTRIES, INC.,        )   Judge Cercone
                             )   Magistrate Judge Hay
             Defendant.      )
```

## REPORT AND RECOMMENDATION

I. RECOMMENDATION

   It is respectfully recommended that defendant's motion for summary judgment pertaining to plaintiff's claims regarding defendant's Circleville, Ohio Plant (Docket No. 32) be granted, and that plaintiff's refiled motion for summary judgment (Docket No. 12) be denied.

II. REPORT

   Presently before this Court for disposition are cross-motions for summary judgment brought by the parties with respect to the allegations in the complaint pertaining to PPG's Circleville, Ohio Plant ("the Circleville Plant").

   Plaintiff, International Chemical Workers Union Council of the United Food and Commercial Workers Union and its Locals 45C and 776C ("Chemical Workers" or "the Union"), commenced this

action against defendant PPG Industries, Inc. ("PPG") under
section 301 of the Labor Management Relations Act ("LMRA"), 29
U.S.C. § 185, after PPG notified retirees from, inter alia, the
Circleville Plant in January of 2001 that it was modifying their
medical benefits.[1]  The Union alleges that PPG has reneged on its
agreement not to reduce or terminate medical benefits for
retirees and that PPG's refusal to accept and/or arbitrate the
Chemical Workers grievance in this regard violates its
contractual obligations under the relevant Collective Bargaining
Agreements ("CBAs").

Cross-motions for summary judgment have now been filed
in which the Union argues that under the broad arbitration
clauses contained in the relevant CBAs PPG is obligated to
arbitrate the issue of whether the benefits at issue vested and
that this Court need only inquire into whether the benefits here

---

[1]     As the Court is probably aware, the Union has
also alleged in this case that PPG has violated
the terms of Collective Bargaining Agreements
governing employment at PPG's Natrium Plant in
Martinsville, West Virginia.  Because of the
nuances in the various documents associated with
each plant, PPG has filed separate motions
regarding each plant, which will be dealt with in
separate Report and Recommendations.  It should
also be noted that there are two related cases to
this one in which unions other than the Chemical
Workers have brought similar allegations against
PPG for violating various CBAs negotiated by
those unions on behalf of PPG employees at other
plants.  See United Steel Workers of America,
AFL-CIO-CLC v. PPG Industries, Inc., C.A. No. 01-
1601, and Local Lodge 470 of District 161,
International Association of Machinists and
Aerospace Workers v. PPG Industries, Inc., C.A.
No. 01-2110.  A different set of motions has been
filed in each of these cases which will also be
addressed separately.

are the type that could vest before compelling PPG to do so.  As well, the Union contends that it has provided sufficient evidence to support a finding that the benefits were meant to vest so as to survive summary judgment.[2]  PPG, on the other hand, has taken the position that the instant dispute revolves around insurance benefits which, under the pre-1993 CBAs, were exempted from arbitration and that it nevertheless has no duty to arbitrate because the benefits at issue had not vested while the relevant CBAs were in effect.

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.Civ. P. 56(c).  Summary judgment may be granted against a party who fails

---

[2]      We note here that after the original motions for summary judgment were withdrawn, the Court requested that each party wishing to renew its motion after discovery was completed resubmit a completely new motion at the appropriate civil action number so that the record in each case would be self contained and so that the Court would not have to go on a fishing expedition to retrieve the documents needed to resolve each motion.  The Union for some reason was unable to abide by this request and has simply filed a notice that it is reinstating the earlier motion, supporting brief and part of the exhibits filed in this case on behalf of the plaintiffs in all three cases in April of 2002.  See Docket No. 12. Because the cases were consolidated at that point in time, the Union's motion for summary judgment and supporting brief are docketed at C.A. No. 01-1601 and appear at Docket Nos. 13 and 14.

to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial* ... or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  Thus, it must be determined "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

PPG initially argues that the Union's claims involve disputes over retiree medical insurance benefits and, thus, are not arbitrable since each of the relevant CBAs contained a provision which expressly exempted from the grievance and arbitration procedure claims for insurance benefits.  PPG points to the September 22, 1986 CBA, and specifically to Section 3 of Article XIX which provides that:

4

> Section 3:    Any claim filed for insurance
> benefits granted under this Article XIX shall
> not be subject to the procedures of Article
> XVII and XVIII [the grievance and arbitration
> articles], provided that the Company has made
> available through contracts of insurance the
> benefits outlined above.

PPG Exh. 2: 9/22/86 CBA, Article XIX, Section 3, p. 27.[3]  See PPG

Exh. 16: Abernathy Aff. ¶ 12.  PPG submits that because the

substance of the grievance that the Union wishes to arbitrate is

whether retirees from the Circleville Plant are entitled to

payments under the insurance program applicable to them at the

time of retirement, it is exempt from arbitration under Article

XIX.

Although the Union has not responded to PPG's argument

in this regard, review of the provision cited by PPG does not

appear to be as broad as PPG would have us find nor is the

grievance that the Chemical Workers seek to arbitrate quite so

narrow.  Indeed, the issue in this case is not merely whether a

insured employee who has submitted a claim for insurance is

entitled to those benefits under the terms of the CBA but,

rather, it is whether PPG's proposed reduction of the benefits to

which the employee would otherwise be entitled infringes on a

right that has vested or accrued.  While disputes over filed

insurance claims may be exempt from arbitration under Article XIX

it does not appear that PPG's modification to the availability of

benefits in the first instance falls under the same category.

---

[3]        Unless otherwise indicated, all of the exhibits
submitted by PPG appear at Docket No. 34.

Thus, it does not appear that Section 3 of Article XIX applies to the present dispute and does not provide the basis for finding that the Union's claims are not arbitrable.

PPG next submits that the remaining issue before the Court is whether or not the benefits at issue vested or accrued which, in turn, will dictate whether it should be compelled to arbitrate the instant dispute. The Union counters arguing that the question of whether the benefits are vested goes to the merits of the dispute and is properly decided in arbitration and that in order to compel arbitration the Court need only determine that the claim at issue is the type that could be vested. This Court, however, has already rejected the Union's position in this regard and has determined that before arbitration may be compelled, the Court must first decide whether the rights at issue, in fact, vested or accrued.

Indeed, review of the record shows that while the Union's original motion for summary judgment was pending, PPG filed a motion to compel discovery arguing that it needed discovery in order to challenge the Union's position posited in its motion that the benefits at issue vested under the relevant CBAs. PPG's position was that because at least some of the agreements at issue had expired prior to the decision to reduce benefits, the arbitration provisions contained in those agreements were inapplicable. Magistrate Judge Benson, who was then presiding over the pretrial matters in this case, was therefore put in the position of having to determine what

discovery, if any, was appropriate under Rule 26(b)(1), while mindful of the Court's limited authority to decide the underlying issues involved in a suit to compel arbitration.

In resolving the issue, Magistrate Judge Benson relied principally on Litton Financial Printing Division v. NLRB, 501 U.S. 190 (1991)("Litton"), which, like the instant case, involved whether disputes arising under an expired CBA are subject to the arbitration provision contained therein.  The Litton Court held that the presumption previously announced by the Supreme Court in Nolde Brothers, Inc. v. Bakery Workers, 430 U.S. 243 (1977)("Nolde"), that the duty to arbitrate disputes arising under an agreement outlasts the date of expiration, only applies to "disputes arising under the contract."  The Court went on to find that "postexpiration grievances can be said to arise under a contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement."  Litton, 501 U.S. at 205-06.  Magistrate Judge Benson recognized, as other courts have, that despite the fact that the Litton Court expressly declined to overrule Nolde, the two decisions were incongruous.  Memorandum Order, Benson, M.J. (August 2, 2002) (Docket No. 16).

In an effort to resolve the apparent "tension" between Litton and Nolde, Magistrate Judge Benson took instruction from

Luden's Inc. v. Local Union No. 6, 28 F.3d 347 (3d Cir. 1994)("Luden"), in which the Court of Appeals for the Third Circuit noted, albeit in *dicta*, that Litton held that "a court has the *duty* to reach the merits of the claim, and can order arbitration only if it concludes that the lapsed CBA in fact creates the right or obligation at issue."  Memorandum Order, p. 6, quoting Luden, 28 F.3d at 353-54 (emphasis in original). Opining that the rule set forth in Litton was the Supreme Court's latest and unequivocal statement of the law, Magistrate Judge Benson applied Litton's holding to the instant case and held that: "In this case, where post-expiration conduct is alleged to have violated a right that accrued or vested during the term of a now-expired collectively bargained agreement, the court must make inquiry into whether the right at issue actually vested or accrued while the contract was in force."  Memorandum Order, p. 7.

It therefore appears, contrary to the Union's assertion, that Magistrate Judge Benson has already determined that the Court must decide whether the benefits at issue vested or accrued prior to the expiration of the relevant CBAs which, in turn, will dictate whether the case should be subject to arbitration.  Because the district court subsequently denied the Unions' objections to Magistrate Judge Benson's Memorandum Order it now appears to be the law of the case.  See Order of Court, Ziegler, J. (October 18, 2002)(C.A. 01-1601: Docket No. 46).  See also In re City of Philadelphia Litigation, 158 F.3d 711, 718 (3d

Cir. 1998)(Finding that absent extraordinary circumstances such as the availability of new evidence, a supervening new law or where the earlier decision was clearly erroneous, the law of the case doctrine precludes the reconsideration of previously decided issues.)

The Union nevertheless makes much of Magistrate Judge Benson's language that the Court only has to "make inquiry" into whether the right at issue actually vested or accrued, arguing that "making an inquiry" into whether the right vested is somehow distinct from actually determining whether the right vested and only requires the Court determine if it is the type of claim that could be vested.  We disagree.

Not only has Magistrate Judge Benson already rejected the Union's position that merely having an arguable basis for asserting that the right to retiree welfare benefits vested under the contract is sufficient to compel arbitration, see Memorandum Order, p. 5, but the Union appears to ignore the rest of the Magistrate's Memorandum Order which, when read as a whole, clearly indicates that the Court is required to determine whether or not the benefits at issue here vested before it can determine whether the Union's claims are subject to the relevant arbitration provisions.  As already discussed, the holding in Litton, as quoted by Magistrate Judge Benson, states that a post-expiration grievance can be said to arise under a contract, thereby giving rise to the presumption of arbitrability, only where, inter alia, "an action taken after expiration infringes on

a right that accrued or vested under the agreement." Id. at 3.
It does not say that the presumption applies where the claim at
issue is merely the type of claim that could be vested. Further,
Magistrate Judge Benson specifically stated that the issue in
Litton was "whether the contractual right at issue 'vested or
accrued' while the CBA was in effect." Id. He did not interpret
the issue as being whether the contractual right at issue was the
type that could be vested or accrued. Indeed, contrary to the
Union's suggestion, the Litton majority did not merely find that
the right to have seniority considered in making layoffs was not
the type of claim that could be vested but, as noted by
Magistrate Judge Benson, it found that the right had, in fact,
not vested or accrued prior to the expiration of the contract.
Id. at 4.

        Moreover, as the Union appears to acknowledge,
Magistrate Judge Benson clearly relied on the Third Circuit's
findings in Luden, which describes Litton as holding that "a
court has the *duty* to reach the merits of the claim, and can
order arbitration only if it concludes that the lapsed CBA in
fact creates the right or obligation at issue." Id. at 6. The
Luden Court did not find, nor did Magistrate Judge Benson, that
Litton stood for the proposition that the Court is precluded from
reaching the merits of the underlying dispute or that the Court
need only determine if the claim is the type that could be
vested.

10

Finally, following Magistrate Judge Benson's statement that "the Court must 'make inquiry' into whether the right at issue actually vested or accrued while the contract was in force," he described his findings as requiring the court to address the merits of the issue.[4]  Under these circumstances, the Union's position that neither <u>Litton</u> nor Magistrate Judge Benson's Memorandum Order requires the court to address the merits of the dispute or to determine whether the benefits at issue here actually vested is not only without merit but is contrary to the law of the case.

As such, we turn to the issue of whether the benefits at issue in this case vested.

As a preliminary matter, we note that the Union has argued that, rather than follow Third Circuit precedent in deciding this issue, the Court should apply precedent as set forth by arbitrators who have decided vesting disputes because the parties in this case "bargained for ... a determination by an arbitrator."  Plaintiff's Brief at p. 36 (Docket No. 44).  Of course, the difficulty with the Union's argument, aside from the fact that it has offered no authority to support its position, is that it remains to be seen whether the parties bargained for this

---

[4]     Specifically, Magistrate Judge Benson stated that, "To say, however, that in this case the court must address the merits of the issue, and, hence, that the parties are permitted to conduct discovery, is not to answer the precise question before the court: exactly <u>what</u> discovery is proper?"  Memorandum Order, p. 7.

particular dispute to be arbitrated.  Whether or not the parties agreed to arbitrate is a determination that is properly made by the Court and, under Third Circuit precedent, requires the Court -- not an arbitrator -- to decide whether the benefits at issue vested.  Litton, supra.  The fact that the Court may simultaneously resolve the issue that the Union seeks to arbitrate does not appear to be avoidable and nevertheless does not provide the basis for ignoring the law of the this circuit.

Indeed, in Litton, the Supreme Court expressly recognized that it could not avoid the duty of determining whether the parties agreed to arbitrate a post-expiration dispute simply because that determination would require it to interpret the language of a bargaining agreement, a responsibility typically within the purview of the arbitrator.  Id. at 209.  In fact, the Court proceeded to do just that when, in order to determine whether the dispute over layoffs was arbitrable, it found that the right at issue in that case had not vested during the term of the Agreement.  Id. at 209-210.  Because the issue here, like in Litton, is whether the parties agreed to arbitrate in the first instance, it is an issue properly resolved by the Court under the precedent binding on this Court.

We therefore turn to the Third Circuit's opinion in International Union, United Authomobiule, Aerospace & Agricultural Implement Workers of America v. Skinner Engine Co., 188 F.3d 130 (3d Cir. 1999)("Skinner"), which appears to govern the instant dispute.

As found by the Court in <u>Skinner</u>, ERISA recognizes two types of employee benefit plans: employee welfare plans, which are at issue here, and employee pension plans. <u>Id.</u> at 137. Although pension plans have elaborate vesting requirements under ERISA, it does not require automatic vesting of welfare benefit plans. <u>Id</u>. As the Third Circuit has explained, the difference was not accidental, but, rather, a recognition by Congress that employers need some flexibility regarding their right to alter medical plans due to the fact that the "'costs of such plans are subject to fluctuating and unpredictable variables'" such as "'inflation, changes in medical practice and technology, and increases in the cost of treatment independent of inflation.'" <u>Id</u>. at 138, quoting <u>Moore v. Metropolitan Life Ins. Co.</u>, 856 F.2d 488, 492 (2d Cir. 1988).

It is undisputed, however, that "in some situations, a welfare plan may provide a vested benefit." <u>In Re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation</u>, 58 F.3d 896, 902 (3d Cir. 1995)("<u>Unisys</u>"). <u>See Skinner</u>, 188 F.3d at 138. It is the plan participant's burden to prove, by a preponderance of the evidence, that the employer intended the welfare benefits to vest for life. <u>Id</u>. at 138-39. The Court of Appeals for the Third Circuit, however, has cautioned that:

> to vest benefits is to render them forever unalterable. Because vesting of welfare benefit plans constitutes an extra-ERISA commitment, an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language.

\*        \*        \*

> These cautionary principles apply without
> regard as to whether the employee welfare
> benefits are provided under a collective
> bargaining agreement, SPD [summary plan
> description], or other plan document; the
> same underlying considerations are present
> irrespective of the particular type of
> document at issue.

Id. at 139.  See Unisys, 58 F.3d at 902 ("[A]ny retiree's right

to a lifetime medical benefit under a plan can only be found if

established by the terms of the ERISA-governed employee benefit

plan .... A court must examine the plan documents.")

It also appears undisputed that while collective

bargaining agreements are generally governed by federal law,

traditional rules of contract construction apply when not

inconsistent with federal labor law.  See Skinner, 188 F.3d at

138.  Moreover, how a plan document or CBA should be interpreted

is typically a question of law and where a CBA is clear and

unambiguous, its meaning must be determined as a matter of law.

Id.

In the instant case, it appears undisputed that PPG and

the Chemical Workers have had a collective bargaining

relationship at the Circleville Plant since September 20, 1965.

PPG Exh. 1: 9/20/65 CBA.  See PPG Exh. 16: Abernathy Aff. ¶ 5.

Although health insurance benefits were negotiated by the parties

it appears that they were provided for and described only in an

Equitable Life Assurance policy.  PPG Exh. 16: Abernathy Aff. ¶

7.  Indeed, the first CBA provides that:

Section 2.

14

> (a)  The present schedule of benefits as provided
>      under the Hospital Benefit Plan which has
>      heretofore been available to the employees
>      under Group Hospitalization Insurance Policy
>      No. 11997 ... shall be continued under Group
>      Hospitalization Insurance Policy No. 6100-H
>      .... An employee with dependents shall pay
>      six dollars and fifty cents ($6.50) per month
>      toward the cost of such plan.  An employee
>      without dependents shall pay two dollars
>      ($2.00) per month toward the cost of such
>      plan.

PPG Exh. 1: 9/20/65 CBA, Article XIX, Section 2(a).  See PPG Exh.
16: Abernathy Aff. ¶ 8.  Beginning in January of 1976, however,
the benefit descriptions were included in a booklet entitled
Group Insurance Plan or Group Benefits Plan ("GIP").[5]  See PPG
Exh. 16: Abernathy Aff. ¶ 7.

It also appears that the January 30, 1976 GIP is the
first Circleville Plant GIP to provide for retiree medical
benefits.  Specifically, it provides that:

> Retirement
>
> 10.7     If at the time you retire under the
>          Pension Agreement other than on a Deferred
>          Vested Pension ... the following provisions
>          will be applicable to your coverage under the
>          program:
>
>                  *       *       *
>
> (c)  Medical Expense Insurance and Dental
>      Expense Benefits
>
>      Such coverage, except Dental
>      Expense Benefits, will be continued
>      in effect thereafter provided you

---

[5]  GIPs are also referred to as Summary Plan
     Descriptions ("SPDs"), which is the moniker used
     by the Union.  Because the booklets describing
     the benefits in this case are called Group
     Insurance Plans we have referred to them as GIPs.

> timely pay the required
> contributions, but will be reduced
> by any benefits provided by
> Medicare.

PPG Exh. 3: 1/30/76 GIP § 10.7.  <u>See</u> PPG Exh. 17: Logan Aff. ¶ 5.

Each succeeding GIP, it appears, contains this provision as well.

<u>See</u> PPG Exh. 17: Logan Aff. ¶ 6.

It also appears undisputed that in 1986, the CBAs began

to refer to and incorporate the GIPs as follows:

> <u>    Section 1</u>.   The Company will provide the
> following insurance programs the terms of
> which are detailed in the booklet entitled
> "Group Insurance Plan" for hourly employees
> of International Chemical Workers (Local 776)
> at Circleville, Ohio, and which is by
> reference incorporated as part of this
> agreement and a copy of which is provided to
> each employee:
> > 1)   Hospital, Surgical and Major
> >       Medical Insurance
> > 2)   Dental Expense Insurance
> > 3)   Group Life Insurance
> > 4)   Accidental and Sickness Insurance

PPG Exh. 2: 9/22/86 CBA, Article XIX, Section 1.  <u>See</u> PPG Exh.

16: Abernathy Aff. ¶ 9.  This language, it appears, is contained

in every subsequent CBA governing the Circleville Plant.  PPG

Exh. 16: Abernathy Aff. ¶ 10.  <u>See</u> Union Exhs. B1-B6: 1986, 1989,

1992, 1995, 1998 and 2001 CBAs, respectively, Article XIX,

Section 1.[6]

PPG argues that there is not only no clear and express

language in any of the plan documents governing the Circleville

---

[6]       These exhibits were submitted with the Unions'
earlier filed motion for summary judgment and
appear as Exhibits to the Affidavit of Lawrence
Potts filed at Docket No. 12.

Plant which would indicate a commitment by PPG to vest retiree medical benefits but that the language that is contained in the documents expressly limits PPG's obligation in this respect for the duration of the CBA.  Specifically, PPG points to the fact that each Circleville CBA since the September 20, 1965 CBA provides that:

> It is further understood and agreed no rights, privileges, duties or obligations provided for in this Agreement shall extend beyond the terms of this Agreement.

PPG Exh. 1: 9/20/65 CBA, Article XX, Section 3.  See PPG Exh. 16: Abernathy Aff. ¶ 14.  As well, each CBA since September 22, 1986, contains a "Term of Contract" provision, which states that:

> Section 1.    This Agreement shall remain in full force and effect from September 22, 1986, to 6:00 p.m., September 24, 1989, and shall automatically renew itself from year to year thereafter unless either party desires to discontinue or modify the existing Agreement upon any termination date; at least sixty (60) days prior written notice of such intent must be given to the other party hereto.
>
> *       *       *
>
> Section 2.    This Agreement constitutes a complete understanding of the parties on all questions of wages, hours, and other terms or conditions of employment, and each party to this Agreement hereby expressly waives any right to insist that the other party bargain collectively during the life of this Agreement with respect to any economic or non-economic demands ....

PPG Exh. 2: 9/22/86 CBA, Article XX, Sections 1, 2.  See PPG Exh. 16: Abernathy Aff. ¶ 15.

17

Moreover, PPG has provided evidence that since 1986, each of the GIPs also contains language that its obligation to provide retiree medical benefits was limited to the duration of the CBA then in effect.  Indeed, the October 1, 1986 GIP provides that:

> The Company will continue the benefits
> described herein for active and retired
> employees consistent with the terms and
> conditions of the labor agreement for the
> duration of such agreement.... In the event
> of termination of the labor agreement, you
> have the same rights as to claim submission
> and review and conversion rights as you would
> have under individual termination of
> coverage.

PPG Exh. 4: 10/1/1986 GIP, pp. 4-5.  See PPG Exh. 17: Logan Aff. ¶¶ 7, 8.  Under these terms, PPG submits, it maintained the right to modify or terminate such benefits following the expiration of the CBA.

The Union does not dispute that these provisions are contained in the relevant plan documents pertaining to the Circleville Plant, nor does it point to any clear and express language in the plan documents which would suggest that PPG intended for retiree medical benefits to vest.  Rather, the Union contends that it did not bargain for the duration clauses set forth in the GIPs and that, nevertheless, only the benefit terms were incorporated into the CBAs and not the duration clauses.

The Union, however, has not provided any support for its position that PPG unilaterally inserted the duration clause in the GIPs or that it was unaware of the fact that they had been included, but instead asks the Court to infer as much from the

18

fact that the clause began appearing in the GIPs somewhere between 1984 and 1987 and that it subsequently became an issue in 1993 after PPG first indicated that a modification in benefits might be forthcoming.

Even if it were true, however, that PPG surreptitiously inserted the language in the GIP, it is undisputed that the language has been included in every GIP since 1986 and that the Union reviewed each GIP prior to its publication.  Although Mr. Leath, a former union official who negotiated labor agreements with PPG, testified at his deposition that he only reviewed the finalized GIP to ensure that the changes were included and did not review the entire booklet, it does not negate the fact that the whole GIP was given to the Union to reexamine.  See Union Exh. 4: Leath Depo., pp. 84, 92.[7]  See also Tose v. First Pennsylvania Bank, N.A., 648 F.2d 879, 900 (3d Cir.), cert. denied, 454 U.S. 893 (1981) ("Ignorance of the contents of a document or failure to read before signing is no defense to a contractual obligation ....").  Under these circumstances, it appears unreasonable to infer that the Union was somehow unaware of the durational clause until 1993 when PPG decided to make changes in retiree medical benefits.  See Maurer v. Joy Technologies, Inc., 212 F.3d 907, 919 (6th Cir. 2000) (Finding that the union was precluded from arguing that the plaintiffs' retirement benefits vested in light of the reservation of rights

---

[7]     Unless otherwise indicated the Union's Exhibits appear at Docket No. 45.

clause that, while unilaterally inserted by the company, was
conspicuously contained in the insurance booklet and remained
uncontested for three years.)

       Nor do we find persuasive the Union's argument that,
notwithstanding whether it was aware of the duration clause, it
was not included in the portion of the GIP that was incorporated
into the CBA.  To support its position, the Union cites to the
1995 CBA, which provides that: "The Company will provide the
following insurance Programs the terms of which are detailed in
the booklet entitled 'Group Insurance Plan' for hourly employees
of International Chemical Workers (Local 776) at Circleville,
Ohio, and which is by reference incorporated as part of this
agreement ...."  <u>See</u> Union Exh. 1: Potts Aff. ¶ 5.  The Union
then asserts based on this provision that the only items being
incorporated are the benefits themselves and not the duration
clause.  We disagree.

       The plain reading of this provision indicates that the
GIP booklet is being incorporated into the CBA and not merely the
benefit terms contained therein.  Indeed, Mr. Potts' has attested
to as much in his affidavit submitted by the Union.  <u>Id.</u>  Because
the duration clause is contained in the booklet along with the
terms of the insurance Programs it follows that it too was
incorporated into the CBA.

       Moreover, notwithstanding whether the duration clauses
contained in the GIPs were incorporated into the CBAs, it is
undisputed that the CBAs themselves contain a clause limiting the

20

duration of benefits.  As previously discussed, each CBA since
1965 states that, "It is further understood and agreed no rights,
privileges, duties or obligations provided for in this Agreement
shall extend beyond the terms of this Agreement."  See PPG Exh.
1: 9/20/65 CBA, Article XX.  As well, each CBA since 1986
contains a termination provision setting forth the specific dates
that the Agreement "shall remain in full force and effect."  PPG
Exh. 2: 9/22/86 CBA, Article XX.  Thus, it appears, rather than
contain clear and express language which would demonstrate that
PPG intended the retiree medical benefits to vest, the plan
documents contain language indicating just the opposite.

The Union nevertheless argues that the plan documents,
and in particular the language contained in the GIPs stating that
PPG "will continue" the benefits at issue, are ambiguous, thereby
requiring the Court to look beyond the plan documents themselves
to decide the vesting issue.[8]

The Court of Appeals for the Third Circuit, however,
has specifically rejected the notion that under these
circumstances the phrase "will continue" included in provisions
providing medical benefits is ambiguous.  To the contrary, in

---

[8]           We note here that because the Union has filed a
single brief in opposition to PPG's two motions
much of the evidence cited by the Union pertains
only to the Natrium Plant and not to the
Circleville Plant which is at issue here.  See
Plaintiff's Memorandum of Law in Opposition to
PPG's Motion for Summary Judgment (Docket No.
44).

assessing a series of CBAs containing the same "will continue" language at issue here, the Third Circuit found that:

> It cannot be said that the phrases clearly and expressly indicate vesting since there is simply no durational language to qualify these phrases.  That is, the CBAs do not state that retiree benefits "will continue for the life of the retiree," or that they "shall remain unaltered for the life of the retiree."  An equally reasonable interpretation is that the benefits "will continue until the CBA expires," or that they "shall remain ... until the CBA expires." Indeed, the latter interpretation appears to be the more reasonable in light of the durational provisions in all of the CBAs. Section 46 of the 1986-1989 CBA is illustrative: "This Agreement represents a complete resolution of all non economic items and shall, in all of its terms, remain in effect from July 1, 1986 until midnight, June 30, 1989 ...."  Read in conjunction with the durational clauses, the phrases could be interpreted to mean, for instance, that the medical benefits "will continue until midnight of June 30, 1989."

>        *      *      *

> The phrases, "will continue" and "shall remain," as discussed above, are simply not susceptible to more than one reasonable interpretation, and they do not somehow render the CBA's incomplete or ambiguous.

Skinner, 188 F.3d at 141, 146.

The Union nevertheless attempts to distinguish this case from Skinner and argues that the differences require a finding that the "will continue" language found in the instant case is ambiguous.

The Union first contends that because other courts have reviewed language similar to the "will continue" language at issue here and have determined that such language is ambiguous or

vests in favor of retirees this Court should as well.  In so arguing, the Union relies on a series of cases from the Court of Appeals for the Fourth and Sixth Circuits that have followed the Sixth Circuit's holding in <u>International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Yard-Man, Inc.</u>, 716 F.2d 1476 (6th Cir. 1983), <u>cert. denied</u>, 465 U.S. 1007 (1984)("<u>Yard-Man</u>"), in which it was found that such "will continue" language creates a presumption that the parties intended retiree welfare benefits to continue for life. <u>See</u> <u>U.A.W. v. BVR Liquidating, Inc.</u>, 190 F.3d 768 (6th Cir. 1999), <u>cert. denied</u>, 529 U.S. 1067 (2000); <u>Keffer v. H.K. Porter Co.</u>, 872 F.2d 60 (4th Cir. 1989); <u>Smith v. ABS Industries, Inc.</u>, 890 F.2d 841, 847 (6th Cir. 1989).  As acknowledged by the Union elsewhere in its brief, however, the Court of Appeals for the Third Circuit in <u>Skinner</u> specifically, and repeatedly, declined to adopt what has been termed the "<u>Yard-Man</u> presumption" or <u>Yard-Man</u>'s interpretation of the relevant contract language.  <u>Skinner</u>, 188 F.3d at 139, 140, 141.  In fact, the Third Circuit subsequently described its opinion in <u>Skinner</u> as creating a presumption against vesting with respect to welfare benefit plans.  <u>Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health and Welfare Plan</u>, 298 F.3d 191, 196 (3d Cir. 2002).  Thus, it appears that the Union's reliance on <u>Yard-Man</u> and its progeny is misplaced.

Nor do the remaining cases cited by the Union compel a different result as the plan documents in those cases, unlike in

this case, did not contain any clauses limiting the duration of benefits or the terms of the agreement.  See Rossetto v. Pabst Brewing Co., 217 F.3d 539 (7th Cir. 2000), cert. denied, 531 U.S. 1192 (2001); Bidlack v. Wheelabrator Corp., 993 F.2d 603 (7th Cir.), cert. denied, 510 U.S. 909 (1993).  Thus, none of the cases relied upon by the Union serves to find either that an ambiguity exists in the Circleville plan documents or that the retiree benefits vested.

Similarly, the Union has cited several cases for the proposition that "surviving spouse" provisions, i.e., provisions that provide for continued medical insurance coverage for the surviving spouse of a retired employee until the spouse's death, evidence an intent to vest.  See United Rubber, Cork, Linoleum & Plastic Workers v. Pirelli Armstrong Tire Corp., 873 F. Supp. 1093 (M.D. Tenn. 1994); U.A.W. v. Loral Corp., 873 F. Supp. 57 (N.D. Ohio 1994), affirmed, 107 F.3d 11 (6th Cir. 1997).  These cases, however, also relied on the Yard-Man presumption which, as already discussed, the Court of Appeals for the Third Circuit has specifically rejected.  Skinner, 188 F.3d at 139, 140, 141. Moreover, as argued by PPG, there was no language contained in the documents in these cases that expressly limited the duration of the benefits to the term of the agreement as exists here. Thus, these cases do not appear to provide the basis for departing from Skinner or for finding that plan documents at issue in this case are ambiguous.

The Union also argues that because the provisions in the GIPs for Life, Accident and other insurance programs have specific termination language attached to them that the absence of termination language in the plan documents with respect to retiree medical benefits suggests that the latter were intended to vest.  The termination language in those provisions, however, as acknowledged by the Union, indicates that coverage is to end upon retirement and does not serve to limit the duration of benefits enjoyed during retirement as is at issue here.  See Plaintiff's Brief, pp. 18, 53 (Docket No. 44).  In this manner, the fact that the plan documents are devoid of language specifically pertaining to the termination of retiree medical benefits does not negate the other durational clauses contained in the relevant CBAs, particularly that which provides that "no rights, privileges, duties or obligations provided for in this Agreement shall extend beyond the terms of this Agreement."  See PPG Exh. 1: 9/20/65 CBA, Article XX.  Cf. Skinner, 188 F.3d at 147 ("Silence on duration ... may not be interpreted as an agreement to vest retiree benefits in perpetuity.")

Further, the cases relied upon by the Union to support its position are, as before, Yard-man and United Rubber, Cork, Linoleum & Plastic Workers v. Pirelli Armstrong Tire Corp., 873 F. Supp. at 1100, which relied upon Yard-Man.  While these courts may have found that the inclusion of specific durational limitations in other provisions of plan documents suggests that retiree benefits not so limited were intended to vest, they so

found having first accepted the presumption that retiree benefits
were intended to vest.  Proceeding under the opposite presumption
-- that such benefits were not intended to vest -- as we must,
the fact that other provisions may have separate durational
language attached to them does not appear to overcome that
presumption that the CBA limits the provision of all rights
privileges, duties or obligations provided for therein to the
terms of the CBA.  Thus, it does not appear that either <u>Pirelli</u>
or <u>Yard-Man</u> provides the basis for finding an ambiguity or for
ignoring <u>Skinner</u>'s requirement that an employer's commitment to
vest retiree benefits must be stated in clear and express
language in order to overcome the presumption against vesting.

 The Union also seeks to distance this case from <u>Skinner</u>
by pointing out that in that case the Court declined to find that
the "will continue" language was ambiguous since it merely
referred back to prior CBAs which, the Union argues, cannot be
found here.  Indeed, it appears that in <u>Skinner</u> where a new
benefit was being provided the CBA contained language such as
"will be obtained" or "will be instituted" and thereafter stated
either that the benefit "will continue" or "shall be increased."
<u>Skinner</u>, 188 F.3d at 142-43.  Here, because the "will continue"
language was included in the first GIP the Union argues that it
could not have been referring back to a prior CBA and, thus, an
ambiguity exists.  We disagree.

 First, as pointed out by PPG, the "first" GIP that the
Union relies upon to demonstrate that it, too, contains the "will

26

continue" language, is a GIP pertaining to PPG's plant located in Martinsville, West Virginia, and not the Circleville Plant.  See Plaintiff's Brief, pp. 53-4 (Docket No. 44).  It therefore has little relevance to the instant motion and cannot provide the basis for finding an ambiguity in the plan documents at issue here.

Second, even if the "will continue" language appears in the first CBA relevant to the Circleville Plant, unlike in Skinner, it does not necessarily follow that an ambiguity exists. Indeed, the import of Skinner's findings in this regard, as the Union itself has argued, is that the contract must be viewed as a whole and the phrase "will continue" must be read in context rather than in a vacuum.  Here, viewing the CBA as a whole, it is undisputed that it contains a durational clause limiting PPG's obligation with respect to retiree benefits to the term of the contract.  It would therefore appear that when read in context the "will continue" language can be read only to suggest that benefits will continue for the duration of the CBA.

Indeed, it appears significant that in addressing this issue, the Court in Skinner cites to Senn v. United Dominion Industries, Inc., 951 F.2d 806, 816 (7th Cir. 1992), cert. denied, 509 U.S. 903 (1993), in which the first CBA entered into between the parties also contained "will continue" language in the provisions providing for insurance benefits for retired employees.  Id. at 808.  The Court nevertheless found that "it requires more than a statement in a CBA that welfare benefits

'will continue' to create an ambiguity about vesting, for the logical interpretation under our rule is that benefits 'will continue' for the duration of the contract." Id. at 816.  Thus, the fact that the first CBA at issue in this case may have contained the "will continue" language appears of little significance and does not create an ambiguity or negate the fact that under Skinner there must be clear and express language to overcome the presumption against vesting, which is clearly absent here.

In another attempt to convince the Court that an ambiguity exists in this case and that Skinner is somehow distinguishable, the Union points to the fact that the Skinner Court found, at least in part, that the "will continue" language was unambiguous because it applied to benefits for both active and retired employees and that because benefits for active employees cannot vest, it followed that they did not vest for the retired employees either.  The Union then argues that because the "will continued" language in the GIPs in effect when the Union participants retired in this case only applied to retirees Skinner is somehow inapplicable and compels a finding that an ambiguity exists.

The difficulty with the Union's argument, however, is that the provisions providing for benefits in Skinner and those at issue here appear to arise in very different contexts.  In Skinner, the CBAs at issue did not refer to either active or employees at all.  As such, the provisions providing for benefits

28

were clearly meant to apply to both active and retired employees
and the "will continue" language could not be interpreted as
having given vested benefits to retirees alone.  Skinner, 188
F.3d at 135-36, 144.  Here, however, the GIP upon which the Union
relies, sets forth the benefits for retires employees in a
separate section, some of which terminate upon retirement.  See
Union Exh. D1: 1995 Circleville GIP, p. 48 (Docket No. 12).
Thus, the "will continue" language referenced in the paragraph
referring to health care benefits appears to signify only that
coverage for that particular benefit was to continue after
retirement -- a point that PPG does not dispute -- and not that
it was to continue in perpetuity.  This appears particularly true
as the 1995 GIP also contains a duration clause, notably omitted
from the Union's exhibit, which, as previously discussed, states
that:

> The Company will continue the benefits
> described herein for active and retired
> employees consistent with the terms and
> conditions of the labor agreement for the
> duration of such agreement.... In the event
> of termination of the labor agreement, you
> have the same rights as to claim submission
> and review and conversion rights as you would
> have under individual termination of
> coverage.

PPG Exh. 4: 10/1/1986 GIP, pp. 4-5.  See PPG Exh. 17: Logan Aff.
¶¶ 7, 8.  Under these circumstances, the phrase "will continue"
does not appear to be ambiguous and does not provide the basis
for ignoring the duration clauses evident in both the Circleville
GIPs and CBAs.

Finally, the Union argues that PPG's failure to include a "reservation of rights" provision in any of the GIPs evidences that PPG knew it did not have the right to modify benefits. The Union, however, has cited no authority for its position or any that would support a finding that a reservation of rights clause must be included in order to express the intent that benefits were not to vest. Perhaps the Union has not done so in light of Skinner, which demonstrates that under the law of this circuit a duration clause alone can effectively minimize an employer's obligation to provide retiree welfare benefits.

Moreover, as argued by PPG, a reservation of rights clause and durational language serve two different purposes. While the former permits an employer to modify or terminate benefits at any time, a durational clause precludes an employer from doing so as long as the CBA is in effect. Thus, the absence of a reservation of rights clause in the Circleville GIPs merely prevented PPG from modifying or terminating any benefits while the relevant CBA was still in effect and does not, as the Union would have us find, undermine the duration clause or demonstrate an ambiguity in the plan documents.[9]

---

[9]     We decline to alter our findings here based on the Union's Notice of New Authority filed on September 29, 2005. Not only is the case upon which it relies an unpublished case from the District of Arizona but its cursory finding that "contrary inferences as to intent are possible" on the limited facts developed is of little help. ASARCO v. United Steel Workers of America, 2005 U.S. Dist. LEXIS 20873 *9 (D. Az. July 26, 2005). Moreover, to the extent that the Court found the language in the CBA ambiguous because it provided

(continued...)

It therefore appears that the plan documents pertaining to the Circleville Plant are not only devoid of clear and express language indicating PPG's intent to vest retiree welfare benefits, but they are without ambiguity, thereby precluding a finding that PPG intended for retiree medical benefits to vest.[10]

---

[9]     (...continued)
that benefits "shall continue," it appears contrary to the Third Circuit's finding in Skinner.  Further, with respect to the reservation of rights ("ROR") issue, the CBA in that case contained a clause stating that "health benefits provided are 'subject to the rules and regulations of the Plan not in conflict with [the CBA].'" Id. at * 12.  Because the CBA provided for what could be vested benefits, the Court found that the ROR in the SPDs, which was not bargained for, was subordinate to the CBA and could not affect what could be contractually vested or bargained for rights.  Not only are the facts in our case distinguishable with respect to language and documents but it does not appear that the question of whether the defendants acquiesced to the inclusion of the ROR or whether they waived their right to object to its insertion was addressed by the Court.  Having found that the Union, in fact, waived its right to object to the duration clause at issue here, ASARCO does not appear to compel a different result.

[10]     Having so found, we reiterate here that it is the plan documents that control and which the Court must assess to determine whether the right to lifetime benefits has been established.  Unisys, 58 F.3d at 902.  While we are mindful of the fact that extrinsic evidence may be used to determine whether an ambiguity exists in a plan document, it may not be used to create an ambiguity where none exists.  See Skinner, 188 F.3d at 145.  Indeed, quoting from Bidlack v. Wheelabrator Corp., 993 F.2d at 608, the Court in Skinner opined that before extrinsic evidence should be considered, "there must be either contractual language on which to hang the label of ambiguous or some yawning void ... that cries out for an implied term.  Extrinsic evidence should not be
(continued...)

As such, the grievance which the Union seeks to arbitrate cannot be said to arise under the contract and, thus, PPG cannot be compelled to arbitrate under the expired CBAs.  Litton, supra.

For these reasons, it is recommended that defendant's motion for summary judgment pertaining to plaintiff's claims regarding defendant's Circleville, Ohio Plant (Docket No. 32) be granted, and that plaintiff's refiled motion for summary judgment (Docket No. 12) be denied.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond

---

[10]          (...continued)
used to add terms to a contract that is plausibly complete without them."  Skinner, 188 F.3d at 146.  Because it appears that no ambiguity exists in the plan documents at issue here we have not considered the extrinsic evidence submitted by the Union.  It should nevertheless be noted that the evidence submitted by the Union consists largely of documents other than plan documents and testimony from Union officials that benefits were meant to vest or statements allegedly made to them by PPG representatives to the same effect.  The Court of Appeals for the Third Circuit has held, however, that neither testimonies of union members as to their belief regarding the duration of retirement benefits nor an employer's oral undertakings serve to modify the written terms contained in plan documents that are otherwise complete.  Skinner, 188 F.3d at 145-147.  See Depenbrock v. CIGNA Corp., 389 F.3d 78, 81-82 (3d Cir. 2004)(ERISA requires that all employee benefit plans be established and maintained pursuant to a written instrument and precludes oral or informal amendments.)  It therefore appears that even if the Court were to consider the Union's extrinsic evidence it would not compel a different result.

thereto.  Failure to file timely objections may constitute a
waiver of any appellate rights.

Respectfully submitted,


/s/ Amy Reynolds Hay
AMY REYNOLDS HAY
United States Magistrate Judge


Dated:    30 September, 2005.

cc:  Hon. David S. Cercone
     United States District Judge

     Michael J. Healey, Esquire
     Healey & Hornack
     Law & Finance Building, Fifth Floor
     Pittsburgh, PA 15219

     Sally M. Tedrow, Esquire
     O'Donoughe & O'Donoughe
     4748 Wisconsin Avenue, NW
     Washington, DC 20016

     Richard J. Antonelli, Esquire
     Spilman Thomas & Battle, PLLC
     One Oxford Centre, Suite 3440
     301 Grant Street
     Pittsburgh, PA 15219

     Melvin P. Stein, Esquire
     United Steel Workers of America
     Five Gateway Center
     Room 807
     Pittsburgh, PA 15222

     William T. Payne, Esquire
     Schwartz. Steinsapir, Dohrmann & Sommers
     1007 Mt. Royal Boulevard
     Pittsburgh, PA 15223

     John E. Stember, Esquire
     Edward J. Feinstein, Esquire
     Pamina Ewing, Esquire
     Stephen M. Pincus, Esquire
     Stember Feinstein Krakoff
     429 Forbes Avenue
     1705 Allegheny Building
     Pittsburgh, PA 15219