IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INTERNATIONAL CHEMICAL          )
WORKERS UNION COUNCIL           )
OF THE UNITED FOOD AND          )
COMMERCIAL WORKERS              )
UNION and its LOCALS 45C and    )
776C,                           )
                                )
            Plaintiff,          )
                                )
        vs.                     )        Civil Action No. 01-1751
                                )
PPG INDUSTRIES, INC.,           )        Judge Cercone
                                )        Magistrate Judge Hay
            Defendant.          )

REPORT AND RECOMMENDATION

I.   RECOMMENDATION

        It is respectfully recommended that defendant's motion
for summary judgment pertaining to plaintiff's claims regarding
defendant's Martinsville, West Virginia Plant (Docket No. 35) be
granted, and that plaintiff's refiled motion for summary judgment
(Docket No. 12) be denied.

II.   REPORT

        Presently before this Court for disposition are cross-
motions for summary judgment brought by the parties with respect
to the allegations in the complaint pertaining to PPG's
Martinsville, West Virginia Plant ("the Natrium Plant").

        Plaintiff, International Chemical Workers Union Council
of the United Food and Commercial Workers Union and its Locals
45C and 776C ("Chemical Workers" or "the Union"), commenced this

action against defendant PPG Industries, Inc. ("PPG") under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, after PPG notified retirees from, <u>inter alia</u>, the Natrium Plant in January of 2001 that it was modifying their medical benefits.[1]  The Union alleges that PPG has reneged on its agreement not to reduce or terminate medical benefits for retirees and that PPG's refusal to accept and/or arbitrate the Chemical Workers grievance in this regard violates its contractual obligations under the relevant Collective Bargaining Agreements ("CBAs").

Cross-motions for summary judgment have now been filed in which the Union argues that under the broad arbitration clauses contained in the relevant CBAs PPG is obligated to arbitrate the issue of whether the benefits at issue vested and that this Court need only inquire into whether the benefits here

---

[1]     As the Court is probably aware, the Union has also alleged in this case that PPG has violated the terms of collective bargaining agreements governing employment at PPG's plant in Circleville, Ohio.  Because of the nuances in the various documents associated with each plant, PPG has filed separate motions regarding each plant, which will be dealt with in separate Report and Recommendations.  It should also be noted that there are two related cases to this one in which unions other than the Chemical Workers have brought similar allegations against PPG for violating various CBAs negotiated by those unions on behalf of PPG employees at other plants.  <u>See</u> <u>United Steel Workers of America, AFL-CIO-CLC v. PPG Industries, Inc.</u>, C.A. No. 01-1601, and <u>Local Lodge 470 of District 161, International Association of Machinists and Aerospace Workers v. PPG Industries, Inc.</u>, C.A. No. 01-2110.  A different set of motions has been filed in each of these cases which will also be addressed separately.

are the type that could vest before compelling PPG to do so.  As well, the Union contends that it has provided sufficient evidence to support a finding that the benefits were meant to vest so as to survive summary judgment.[2]  PPG, on the other hand, has taken the position that it has no duty to arbitrate because the benefits at issue had not vested while the relevant CBAs were in effect.

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.Civ. P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party

---

[2]        We note here that after the original motions for summary judgment were withdrawn, the Court requested that each party wishing to renew its motion after discovery was completed resubmit a completely new motion at the appropriate civil action number so that the record in each case would be self contained and so that the Court would not have to go on a fishing expedition to retrieve the documents needed to resolve each motion.  The Union for some reason was unable to abide by this request and has simply filed a notice that it is reinstating the earlier motion, supporting brief and part of the exhibits filed in this case on behalf of the plaintiffs in all three cases in April of 2002.  See Docket No. 12.  Because the cases were consolidated at that point in time, the Union's motion for summary judgment and supporting brief are docketed at C.A. No. 01-1601 and appear at Docket Nos. 13 and 14.

will bear the burden of proof at trial. <u>Celotex Corp. v.</u>
<u>Catrett</u>, 477 U.S. 317 (1986).  The moving party bears the initial
burden of identifying evidence which demonstrates the absence of
a genuine issue of material fact.  Once that burden has been met,
the non-moving party must set forth "specific facts showing that
there is a *genuine issue for trial* ... or the factual record will
be taken as presented by the moving party and judgment will be
entered as a matter of law.  <u>Matsushita Electric Industrial Corp.</u>
<u>v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986).  An issue is genuine
only if the evidence is such that a reasonable jury could return
a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby,</u>
<u>Inc.</u>, 477 U.S. 242 (1986).  Thus, it must be determined "'whether
the evidence presents a sufficient disagreement to require
submission to a jury or whether it is so one-sided that one party
must prevail as a matter of law.'" <u>Brown v. Grabowski</u>, 922 F.2d
1097, 1111 (3d Cir. 1990), <u>cert</u>. <u>denied</u>, 501 U.S. 1218 (1991),
quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 251-52.

PPG initially argues that the primary issue before the
Court is whether or not the benefits at issue vested or accrued
which, in turn, will dictate whether it should be compelled to
arbitrate the instant dispute.  The Union counters arguing that
the question of whether the benefits are vested goes to the
merits of the dispute and is properly decided in arbitration and
that in order to compel arbitration the Court need only determine
that the claim at issue is the type that could be vested.  This
Court, however, has already rejected the Union's position in this

4

regard and has determined that before arbitration may be compelled, the Court must first decide whether the rights at issue, in fact, vested or accrued.

Indeed, review of the record shows that while the Union's original motion for summary judgment was pending, PPG filed a motion to compel discovery arguing that it needed discovery in order to challenge the Union's position posited in its motion that the benefits at issue vested under the relevant CBAs. PPG's position was that because at least some of the agreements at issue had expired prior to the decision to reduce benefits, the arbitration provisions contained in those agreements were inapplicable. Magistrate Judge Benson, who was then presiding over the pretrial matters in this case, was therefore put in the position of having to determine what discovery, if any, was appropriate under Rule 26(b)(1), while mindful of the Court's limited authority to decide the underlying issues involved in a suit to compel arbitration.

In resolving the issue, Magistrate Judge Benson relied principally on <u>Litton Financial Printing Division v. NLRB</u>, 501 U.S. 190 (1991)("<u>Litton</u>"), which, like the instant case, involved whether disputes arising under an expired CBA are subject to the arbitration provision contained therein. The <u>Litton</u> Court held that the presumption previously announced by the Supreme Court in <u>Nolde Brothers, Inc. v. Bakery Workers</u>, 430 U.S. 243 (1977)("<u>Nolde</u>"), that the duty to arbitrate disputes arising under an agreement outlasts the date of expiration, only applies

5

to "disputes arising under the contract."  The Court went on to find that "postexpiration grievances can be said to arise under a contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement."  Litton, 501 U.S. at 205-06.  Magistrate Judge Benson recognized, as other courts have, that despite the fact that the Litton Court expressly declined to overrule Nolde, the two decisions were incongruous.  Memorandum Order, Benson, M.J. (August 2, 2002) (Docket No. 16).

In an effort to resolve the apparent "tension" between Litton and Nolde, Magistrate Judge Benson took instruction from Luden's Inc. v. Local Union No. 6, 28 F.3d 347 (3d Cir. 1994)("Luden"), in which the Court of Appeals for the Third Circuit noted, albeit in dicta, that Litton held that "a court has the *duty* to reach the merits of the claim, and can order arbitration only if it concludes that the lapsed CBA in fact creates the right or obligation at issue."  Memorandum Order, p. 6, quoting Luden, 28 F.3d at 353-54 (emphasis in original). Opining that the rule set forth in Litton was the Supreme Court's latest and unequivocal statement of the law, Magistrate Judge Benson applied Litton's holding to the instant case and held that: "In this case, where post-expiration conduct is alleged to have violated a right that accrued or vested during the term of a

6

now-expired collectively bargained agreement, the court must make inquiry into whether the right at issue actually vested or accrued while the contract was in force." Memorandum Order, p. 7.

It therefore appears, contrary to the Union's assertion, that Magistrate Judge Benson has already determined that the Court must decide whether the benefits at issue vested or accrued prior to the expiration of the relevant CBAs which, in turn, will dictate whether the case should be subject to arbitration. Because the district court subsequently denied the Unions' objections to Magistrate Judge Benson's Memorandum Order it now appears to be the law of the case. See Order of Court, Ziegler, J. (October 18, 2002)(C.A. 01-1601: Docket No. 46). See also In re City of Philadelphia Litigation, 158 F.3d 711, 718 (3d Cir. 1998)(Finding that absent extraordinary circumstances such as the availability of new evidence, a supervening new law or where the earlier decision was clearly erroneous, the law of the case doctrine precludes the reconsideration of previously decided issues.)

The Union nevertheless makes much of Magistrate Judge Benson's language that the Court only has to "make inquiry" into whether the right at issue actually vested or accrued, arguing that "making an inquiry" into whether the right vested is somehow distinct from actually determining whether the right vested and only requires the Court determine if it is the type of claim that could be vested. We disagree.

Not only has Magistrate Judge Benson already rejected the Union's position that merely having an arguable basis for asserting that the right to retiree welfare benefits vested under the contract is sufficient to compel arbitration, <u>see</u> Memorandum Order, p. 5, but the Union appears to ignore the rest of the Magistrate's Memorandum Order which, when read as a whole, clearly indicates that the Court is required to determine whether or not the benefits at issue here vested before it can determine whether the Union's claims are subject to the relevant arbitration provisions.  As already discussed, the holding in <u>Litton</u>, as quoted by Magistrate Judge Benson, states that a post-expiration grievance can be said to arise under a contract, thereby giving rise to the presumption of arbitrability, only where, <u>inter alia</u>, "an action taken after expiration infringes on a right that accrued or vested under the agreement."  <u>Id.</u> at 3. It does not say that the presumption applies where the claim at issue is merely the type of claim that could be vested.  Further, Magistrate Judge Benson specifically stated that the issue in <u>Litton</u> was "whether the contractual right at issue 'vested or accrued' while the CBA was in effect."  <u>Id.</u>  He did not interpret the issue as being whether the contractual right at issue was the type that could be vested or accrued.  Indeed, contrary to the Union's suggestion, the <u>Litton</u> majority did not merely find that the right to have seniority considered in making layoffs was not the type of claim that could be vested but, as noted by Magistrate Judge Benson, it found that the right had, in fact,

8

not vested or accrued prior to the expiration of the contract. Id. at 4.

Moreover, as the Union appears to acknowledge, Magistrate Judge Benson clearly relied on the Third Circuit's findings in Luden, which describes Litton as holding that "a court has the *duty* to reach the merits of the claim, and can order arbitration only if it concludes that the lapsed CBA in fact creates the right or obligation at issue." Id. at 6.   The Luden Court did not find, nor did Magistrate Judge Benson, that Litton stood for the proposition that the Court is precluded from reaching the merits of the underlying dispute or that the Court need only determine if the claim is the type that could be vested.

Finally, following Magistrate Judge Benson's statement that "the Court must 'make inquiry' into whether the right at issue actually vested or accrued while the contract was in force," he described his findings as requiring the court to address the merits of the issue.[3]   Under these circumstances, the Union's position that neither Litton nor Magistrate Judge Benson's Memorandum Order requires the court to address the merits of the dispute or to determine whether the benefits at

---

[3]       Specifically, Magistrate Judge Benson stated that, "To say, however, that in this case the court must address the merits of the issue, and, hence, that the parties are permitted to conduct discovery, is not to answer the precise question before the court: exactly what discovery is proper?"  Memorandum Order, p. 7.

issue here actually vested is not only without merit but is contrary to the law of the case.

As such, we turn to the issue of whether the benefits at issue in this case vested.

As a preliminary matter, we note that the Union has argued that, rather than follow Third Circuit precedent in deciding this issue, the Court should apply precedent as set forth by arbitrators who have decided vesting disputes because the parties in this case "bargained for ... a determination by an arbitrator."  Plaintiff's Brief at p. 36 (Docket No. 44).  Of course, the difficulty with the Union's argument, aside from the fact that it has offered no authority to support its position, is that it remains to be seen whether the parties bargained for this particular dispute to be arbitrated.  Whether or not the parties agreed to arbitrate is a determination that is properly made by the Court and, under Third Circuit precedent, requires the Court -- not an arbitrator -- to decide whether the benefits at issue vested.  Litton, supra.  The fact that the Court may simultaneously resolve the issue that the Union seeks to arbitrate does not appear to be avoidable and nevertheless does not provide the basis for ignoring the law of the this circuit.

Indeed, in Litton, the Supreme Court expressly recognized that it could not avoid the duty of determining whether the parties agreed to arbitrate a post-expiration dispute simply because that determination would require it to interpret the language of a bargaining agreement, a responsibility

10

typically within the purview of the arbitrator.  Id. at 209.  In
fact, the Court proceeded to do just that when, in order to
determine whether the dispute over layoffs was arbitrable, it
found that the right at issue in that case had not vested during
the term of the Agreement.  Id. at 209-210.  Because the issue
here, like in Litton, is whether the parties agreed to arbitrate
in the first instance, it is an issue properly resolved by the
Court under the precedent binding on this Court.

We therefore turn to the Third Circuit's opinion in
International Union, United Authomobiule, Aerospace &
Agricultural Implement Workers of America v. Skinner Engine Co.,
188 F.3d 130 (3d Cir. 1999)("Skinner"), which appears to govern
the instant dispute.

As found by the Court in Skinner, ERISA recognizes two
types of employee benefit plans: employee welfare plans, which
are at issue here, and employee pension plans.  Id. at 137.
Although pension plans have elaborate vesting requirements under
ERISA, it does not require automatic vesting of welfare benefit
plans.  Id.  As the Third Circuit has explained, the difference
was not accidental, but, rather, a recognition by Congress that
employers need some flexibility regarding their right to alter
medical plans due to the fact that the "'costs of such plans are
subject to fluctuating and unpredictable variables'" such as
"'inflation, changes in medical practice and technology, and
increases in the cost of treatment independent of inflation.'"

_Id_. at 138, quoting <u>Moore v. Metropolitan Life Ins. Co.</u>, 856 F.2d 488, 492 (2d Cir. 1988).

It is undisputed, however, that "in some situations, a welfare plan may provide a vested benefit."   <u>In Re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation</u>, 58 F.3d 896, 902 (3d Cir. 1995)("<u>Unisys</u>").   <u>See</u> <u>Skinner</u>, 188 F.3d at 138.   It is the plan participant's burden to prove, by a preponderance of the evidence, that the employer intended the welfare benefits to vest for life.   _Id_. at 138-39.   The Court of Appeals for the Third Circuit, however, has cautioned that:

> to vest benefits is to render them forever unalterable.  Because vesting of welfare benefit plans constitutes an extra-ERISA commitment, an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language.
>
> *       *       *
>
> These cautionary principles apply without regard as to whether the employee welfare benefits are provided under a collective bargaining agreement, SPD [summary plan description], or other plan document; the same underlying considerations are present irrespective of the particular type of document at issue.

_Id_. at 139.   <u>See</u> <u>Unisys</u>, 58 F.3d at 902 ("[A]ny retiree's right to a lifetime medical benefit under a plan can only be found if established by the terms of the ERISA-governed employee benefit plan .... A court must examine the plan documents.")

It also appears undisputed that while collective bargaining agreements are generally governed by federal law, traditional rules of contract construction apply when not

inconsistent with federal labor law.  <u>See</u> <u>Skinner</u>, 188 F.3d at 138.  Moreover, how a plan document or CBA should be interpreted is typically a question of law and where a CBA is clear and unambiguous, its meaning must be determined as a matter of law. <u>Id</u>.

In the instant case, it appears undisputed that PPG and the Chemical Workers have had a collective bargaining relationship at the Natrium Plant since June 4, 1950.  <u>See</u> PPG Exh. 1: 6/4/50 CBA; PPG Exh. 25: Abernathy Aff. ¶ 5.[4]  It also appears undisputed that the November 11, 1961 CBA, and each succeeding CBA, provide that:

> * 4. The Company agrees to extend to the employees in the bargaining unit represented by the Union the benefit plans as follows:
>
>> (a)  Group Life Insurance;
>>
>> (b)  Health and Accident Insurance;
>>
>> (c)  Hospitalization Insurance, including surgical, medical, and major medical coverage.

PPG Exh. 2: 11/11/61 CBA, Article XVII, p. 53.  <u>See</u> PPG Exh. 25: Abernathy Aff. ¶¶ 8, 9.

As well, it appears that the welfare benefits provided to the employees at the Natrium Plant were set forth in a booklet entitled Group Insurance Plan or Group Benefits Plan ("GIP") that

---

[4]     Unless otherwise indicated PPG's Exhibits appear at Docket No. 37.

was issued following the negotiation of each new CBA.[5]  See PPG
Exh. 25: Abernathy Aff. ¶ 7.  Although the Natrium Plant CBAs do
not reference the GIPs, it appears undisputed that each GIP was
considered part of the corresponding CBA.  See PPG Exh. 3: Montes
Depo., p. 95.  Indeed, each GIP since 1977 states that:

> This Program has been established pursuant to
> the Labor Agreement effective between PPG
> Industries, Inc. and Local No. 45,
> International Chemical Workers Union, 130
> North Street, New Martinsville, W. Va. 26155.
> A copy of the Labor Agreement, of which the
> Insurance Agreement is a part, will be
> available to Plan Participants upon written
> request to the Plan Administrator.

PPG Exh. 4: 6/9/77 GIP.  See PPG Exh. 25: Abernathy Aff. ¶ 10.

It also appears undisputed that the GIP from 1961 is
the first Natrium Plant GIP to provide for benefits upon
retirement.  Specifically, it provides that:

> PROVISIONS APPLICABLE IF YOU CEASE ACTIVE
> WORK DUE TO THE FOLLOWING:
>
> *      *      *
>
> 6.  Retirement
>
> After retirement your insurance will
> continue until the end of the month in which
> retirement occurs and thereafter your
> insurance and contributions toward such
> insurance will be in accordance with the Plan
> of Insurance applicable to retired employees.

PPG Exh. 6: 1961 GIP, p. 26.  See PPG Exh. 25: Abernathy Aff. ¶
15.  The 1961 GIP also includes a section describing the

---

[5]      GIPs are also referred to as Summary Plan
Descriptions ("SPDs"), which is the moniker used
by the Union.  Because the booklets describing
the benefits in this case are called Group
Insurance Plans we have referred to them as GIPs.

"Hospital, Surgical and Medical Expense Benefits for Retired Employees and Their Spouse [sic]."  PPG Exh. 6: 1961 GIP, p. 26. <u>See</u> PPG Exh. 25: Abernathy Aff. ¶ 16.  As well, it appears that the February 28, 1972 GIP provided that although retirees would continue to be eligible for the benefits they had been receiving as active employees such benefits would be offset by any payment they received under Medicare.  PPG Exh. 7: 2/28/72 GIP, p. 4. <u>See</u> PPG Exh. 25: Abernathy Exh. ¶ 17.

PPG argues that there is not only no clear and express language in any of the plan documents governing the Natrium Plant which would indicate a commitment by PPG to vest retiree medical benefits but that the language that is contained in the documents expressly limits PPG's obligation in this respect for the duration of the CBA.  Specifically, PPG points to the fact that each Natrium CBA since the November 11, 1961 CBA provides that:

> *1.  This Agreement shall become effective November 11, 1961 and shall remain in full force and effect until eleven o'clock p.m. (11:00 p.m.), February 28, 1964, and from year to year thereafter, unless either party desires to modify or terminate the Agreement, and files a notice in writing of its desire to terminate or modify at least sixty (60) days prior to eleven o'clock p.m. (11:00 p.m.), February 28, 1964, of any subsequent year.

PPG Exh. 2: 11/11/61 CBA, Article XXIV, p. 63.  <u>See</u> PPG Exh. 25: Abernathy Aff. ¶ 13, 14.

Moreover, PPG has provided evidence that since 1987, each of the GIPs also contains language that its obligation to provide retiree medical benefits was limited to the duration of

15

the CBA then in effect.  Specifically, PPG cites to the March 8, 1987 GIP, which appears to be representative of all the subsequent GIPs and provides that:

> The Company will continue the benefits described herein consistent with the terms and conditions of the labor agreement for the duration of such agreement.... In the event of termination of the labor agreement, you have the same rights as to claim submission and review and conversion rights as you would have under individual termination of coverage.

PPG Exh. 8: 3/8/87 GIP, p. 5.  See PPG Exh. 25: Abernathy Aff. ¶¶ 18, 19.  Under these terms, PPG submits, it maintained the right to modify or terminate such benefits following the expiration of the CBA.

The Union does not dispute that these provisions are contained in the relevant plan documents pertaining to the Natrium Plant, nor does it point to any clear and express language in the plan documents which would suggest that PPG intended for retiree medical benefits to vest.  Rather, the Union contends that it not only did not bargain for the duration clauses set forth in the GIPs but that it, in fact, objected to them, and that because the GIPs were nevertheless not incorporated into the Natrium Plant CBAs, the duration clauses set forth therein do not serve to limit the duration of retiree benefits.

Here, unlike with the Circleville GIPs, PPG does not appears to dispute that it inserted the duration clause into the 1987 GIP without discussion with the Union.  It nevertheless

16

contends that it responded to the Union's objections by removing the phrase "active and retired employees," and that the Union's failure to take any subsequent action to have the clause removed demonstrates the Union's acquiescence to its inclusion.

It appears undisputed that the 1987 GIP initially drafted by PPG contained the following clause:

> The Company will continue the benefits
> described herein for active and retired
> employees consistent with the terms and
> conditions of the labor agreement for the
> duration of such agreement.

Union Exh. 13: 1987 Draft GIP, p. 5.[6]  It also appears undisputed that Natrium Local President Mel Montes reviewed the draft and objected to the clause which, after much debate, resulted in PPG removing only the words "for active and retired employees."  PPG Exh. 3: Montes Depo., pp. 125-126.  The Union contends that it was repeatedly assured by PPG that the duration clause would not affect the health benefits for retirees and that, even after the change was made, the clause applied only to active employees. Union Exh. 3: Montes Depo., p. 110; Union Exh. 19: Montes Depo., pp. 48-49.  Based on these assurances, the Union argues that the duration clause cannot be read to include retiree benefits and that, at the very least, it should be sufficient to survive summary judgment.

The difficulty with the Union's argument, however, is that eliminating the phrase "for active and retired employees"

---

[6]     Unless otherwise indicated the Union's Exhibits
        appear at Docket No. 45.

does not alter the meaning of the duration clause or appear to render it ambiguous.  Indeed, because the benefits for both active and retired employees are set forth in the GIP, the limitation that "[t]he Company will continue the benefits described herein ... for the duration of such agreement" can only be read to apply to benefits for both active and retired employees.  See Skinner, 188 F.3d at 135-37, 143-44.

Moreover, as pointed out by PPG, the Union appears to have been aware of this as Mel Montes testified that even with the revision the Union and PPG agreed to disagree and that he was still concerned in July of 1988, after what appears to be the final meeting on the issue, that the final language provided for the termination of benefits with the termination of the labor contract.  See PPG Exh. 3: Montes Depo., pp. 135-26, 163; PPG Suppl. Exh. 1: Montes Depo., p. 170 (Docket No. 49).  Further, although the Union only objected to the reference to "retired employees," PPG refused to eliminate only those words which would clearly have made the durational limitation only applicable to active employees.  PPG Exh. 3: Montes Depo., pp. 126-27.

As well, it appears undisputed that despite earlier indications that he would file an unfair labor charge, Montes never followed through or made any other effort, including filing a grievance, to eliminate the clause.  PPG Exh. 19: Montes Depo., pp. 17-18.  It also appears that the duration clause has remained in every succeeding GIP since it was first included in 1987 without apparent objection from the Union until PPG sought to

invoke the reductions which spawned this litigation.  <u>See</u> PPG
Exh. 25: Abernathy Aff. ¶¶ 18, 19.  Under these circumstances,
the fact that the duration clause was not originally bargained
for does not render it ambiguous or otherwise suggest that PPG
intended for retiree benefits to vest.  <u>See</u> <u>Maurer v. Joy</u>
<u>Technologies, Inc.</u>, 212 F.3d 907, 919 (6th Cir. 2000) (Finding
that the union was precluded from arguing that the plaintiffs'
retirement benefits vested in light of the reservation of rights
clause that, while unilaterally inserted by the company, was
conspicuously contained in the insurance booklet and remained
uncontested for three years.)

Nor do we find persuasive the Union's argument that
because none of the Natrium CBAs refers to or incorporates the
Natrium GIPs, the duration clause contained in the GIPs was not
part of the parties' various agreements.

Although it appears undisputed that the Natrium CBAs do
not contain the same clause found in the CBAs relevant to other
plants that have specifically incorporated the corresponding GIP,
it is nevertheless also clear that the parties understood that
the Natrium GIPs were considered part of the CBAs.  Indeed, when
asked whether language in the 1999 CBA essentially incorporated
the group insurance booklet into the collective bargaining
agreement, Mr. Montes testified, "I believe so," and went on to
state that, "we've always considered [the benefit plan] part of
the labor agreement."  PPG Exh. 3: Montes Depo., p. 95.

In addition, as previously discussed, it appears that each GIP since 1977 states that:

> This Program has been established pursuant to the Labor Agreement effective between PPG Industries, Inc. and Local No. 45, International Chemical Workers Union, 130 North Street, New Martinsville, W. Va 26155. A copy of the Labor Agreement, of which the Insurance Agreement is a part, will be available to Plan Participants upon written request to the Plan Administrator.

PPG Exh. 4: 6/9/77 GIP.  See PPG Exh. 25: Abernathy Aff. ¶ 10. When asked about this provision at his deposition, Mr. Montes agreed that the particular GIP being referenced was part of the corresponding CBA.  PPG Suppl. Exh. 1: Montes Depo., pp. 97-98 (Docket No. 49).  Counsel then asked Mr. Montes, whether it was his understanding generally that, "when the chemical workers and PPG negotiated a collective bargaining agreement and negotiated the various benefits, including health insurance benefits, that the corresponding group insurance plan was incorporated into the negotiated collective bargaining agreement?," to which Montes responded affirmatively.  Id. at p. 98.

As well, Lawrence Potts, another representative of the Union, stated in his affidavit that:

> The terms of the Collective Bargaining Agreements (CBAs) at the Martinsville, West Virginia and Circleville, Ohio facilities provided for retiree medical benefits.  The CBAs typically described or at least referred to the benefits, and provisions fully describing the benefits were contained in separate Benefit Plan booklets.  These booklets were incorporated by reference in the CBAs.

Union Exh. 1: Potts Aff. ¶ 5.

20

Finally, as argued by PPG, the Union seeks to compel arbitration of the dispute over retiree benefits under the terms of the relevant CBA.  The arbitration provision in the Natrium Plant CBAs, however, provide for arbitration "[o]nly for grievances involving alleged violations with respect to the application or interpretation of the terms of this agreement ...."  PPG Suppl. Exh. 2: 3/8/87 CBA, p. 12 (Docket No. 49).  Because the CBA is silent on the issue of retiree medical benefits the Union necessarily seeks to arbitrate provisions contained in the GIP which, under the arbitration provision, it can do only if they are considered part of the CBA.  Under these circumstances, it does not appear that the Union can be heard to argue that the Natrium GIPs, or the duration clauses contained therein, are not part of the CBAs.

The Union nevertheless argues that the plan documents, and in particular the language contained in the GIPs stating that PPG "will continue" the benefits at issue, are ambiguous, thereby requiring the Court to look beyond the plan documents themselves to decide the vesting issue.

The Court of Appeals for the Third Circuit, however, has specifically rejected the notion that under these circumstances the phrase "will continue" included in provisions providing medical benefits is ambiguous.  To the contrary, in assessing a series of CBAs containing the same "will continue" language at issue here, the Third Circuit found that:

> It cannot be said that the phrases clearly
> and expressly indicate vesting since there is

21

> simply no durational language to qualify
> these phrases.  That is, the CBAs do not
> state that retiree benefits "will continue
> for the life of the retiree," or that they
> "shall remain unalterable for the life of the
> retiree."  An equally reasonable
> interpretation is that the benefits "will
> continue until the CBA expires," or that they
> "shall remain ... until the CBA expires."
> Indeed, the latter interpretation appears to
> be the more reasonable in light of the
> durational provisions in all of the CBAs.
> Section 46 of the 1986-1989 CBA is
> illustrative: "This Agreement represents a
> complete resolution of all non economic items
> and shall, in all of its terms, remain in
> effect from July 1, 1986 until midnight, June
> 30, 1989 ...."  Read in conjunction with the
> durational clauses, the phrases could be
> interpreted to mean, for instance, that the
> medical benefits "will continue until
> midnight of June 30, 1989."
>
>             *      *      *
>
> The phrases, "will continue" and "shall
> remain," as discussed above, are simply not
> susceptible to more than one reasonable
> interpretation, and they do not somehow
> render the CBA's incomplete or ambiguous.

Skinner, 188 F.3d at 141, 146.

The Union nevertheless attempts to distinguish this case from Skinner and argues that the differences require a finding that the "will continue" language found in the instant case is ambiguous.

The Union first contends that because other courts have reviewed language similar to the "will continue" language at issue here and have determined that such language is ambiguous or vests in favor of retirees this Court should as well.  In so arguing, the Union relies on a series of cases from the Court of Appeals for the Fourth and Sixth Circuits that have followed the

22

Sixth Circuit's holding in <u>International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Yard-Man, Inc.</u>, 716 F.2d 1476 (6th Cir. 1983), <u>cert. denied</u>, 465 U.S. 1007 (1984)("<u>Yard-Man</u>"), in which it was found that such "will continue" language creates a presumption that the parties intended retiree welfare benefits to continue for life. <u>See</u> <u>U.A.W. v. BVR Liquidating, Inc.</u>, 190 F.3d 768 (6th Cir. 1999), <u>cert. denied</u>, 529 U.S. 1067 (2000); <u>Keffer v. H.K. Porter Co.</u>, 872 F.2d 60 (4th Cir. 1989); <u>Smith v. ABS Industries, Inc.</u>, 890 F.2d 841, 847 (6th Cir. 1989).  As acknowledged by the Union elsewhere in its brief, however, the Court of Appeals for the Third Circuit in <u>Skinner</u> specifically, and repeatedly, declined to adopt what has been termed the "<u>Yard-Man</u> presumption" or <u>Yard-Man</u>'s interpretation of the relevant contract language.  <u>Skinner</u>, 188 F.3d at 139, 140, 141.  In fact, the Third Circuit subsequently described its opinion in <u>Skinner</u> as creating a presumption against vesting with respect to welfare benefit plans.  <u>Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health and Welfare Plan</u>, 298 F.3d 191, 196 (3d Cir. 2002).  Thus, it appears that the Union's reliance on <u>Yard-Man</u> and its progeny is misplaced.

Nor do the remaining cases cited by the Union compel a different result as the plan documents in those cases, unlike in this case, did not contain any clauses limiting the duration of benefits or the terms of the agreement.  <u>See</u> <u>Rossetto v. Pabst Brewing Co.</u>, 217 F.3d 539 (7th Cir. 2000), <u>cert. denied</u>, 531 U.S.

1192 (2001); Bidlack v. Wheelabrator Corp., 993 F.2d 603 (7th Cir.), cert. denied, 510 U.S. 909 (1993).  Thus, none of the cases relied upon by the Union serves to find either that an ambiguity exists in the Natrium plan documents or that the retiree benefits vested.

Similarly, the Union has cited several cases for the proposition that "surviving spouse" provisions, i.e., provisions that provide for continued medical insurance coverage for the surviving spouse of a retired employee until the spouse's death, evidence an intent to vest.  See United Rubber, Cork, Linoleum & Plastic Workers v. Pirelli Armstrong Tire Corp., 873 F. Supp. 1093 (M.D. Tenn. 1994); U.A.W. v. Loral Corp., 873 F. Supp. 57 (N.D. Ohio 1994), affirmed, 107 F.3d 11 (6th Cir. 1997).  These cases, however, also relied on the Yard-Man presumption which, as already discussed, the Court of Appeals for the Third Circuit has specifically rejected.  Skinner, 188 F.3d at 139, 140, 141. Moreover, as argued by PPG, there was no language contained in the documents in these cases that expressly limited the duration of the benefits to the term of the agreement as exists here. Thus, these cases do not appear to provide the basis for departing from Skinner or for finding that plan documents at issue in this case are ambiguous.

The Union also argues that an ambiguity exists because the provisions in the GIPs for Life, Accident and other insurance programs have specific termination language attached to them while the provisions regarding retiree medical benefits state

that they would be "continued in effect thereafter."  The termination language in the former provisions, however, as acknowledged by the Union, indicates that coverage is to end upon retirement and does not serve to limit the duration of benefits enjoyed during retirement as is at issue here.  <u>See</u> Plaintiff's Brief, pp. 18, 53 (Docket No. 44).  The fact that some benefits may cease upon retirement while retiree medical benefits will continue until the expiration of the CBA does not appear to be ambiguous and does not serve to negate the durational clause.  <u>Cf.</u> <u>Skinner</u>, 188 F.3d at 147 ("Silence on duration ... may not be interpreted as an agreement to vest retiree benefits in perpetuity.")

Further, the cases relied upon by the Union to support its position are, as before, <u>Yard-man</u> and <u>United Rubber, Cork, Linoleum & Plastic Workers v. Pirelli Armstrong Tire Corp.</u>, 873 F. Supp. at 1100, which relied upon <u>Yard-Man</u>.  While these courts may have found that the inclusion of specific durational limitations in other provisions of plan documents suggests that retiree benefits not so limited were intended to vest, they so found having first accepted the presumption that retiree benefits were intended to vest.  Proceeding under the opposite presumption -- that such benefits were not intended to vest -- as we must, the fact that some benefits terminate upon retirement does not appear to overcome that presumption that others are limited to the term of the CBA.  Thus, it does not appear that either <u>Pirelli</u> or <u>Yard-Man</u> provides the basis for finding an ambiguity

25

or for ignoring Skinner's requirement that an employer's commitment to vest retiree benefits must be stated in clear and express language in order to overcome the presumption against vesting.

The Union also seeks to distance this case from Skinner by pointing out that in that case the Court declined to find that the "will continue" language was ambiguous since it merely referred back to prior CBAs which, the Union argues, cannot be found here.  Indeed, it appears that in Skinner where a new benefit was being provided the CBA contained language such as "will be obtained" or "will be instituted" and thereafter stated either that the benefit "will continue" or "shall be increased." Skinner, 188 F.3d at 142-43.  Here, because the "will continue" language, according to the Union, was included in the first GIP it argues that it could not have been referring back to a prior CBA and, thus, an ambiguity exists.  We disagree.

First, as pointed out by PPG, the "first" GIP that the Union relies upon to demonstrate that it, too, contains the "will continue" language, is the 1974 Natrium GIP, which is not the first GIP pertaining to the Natrium Plant.  See Plaintiff's Brief, pp. 53-4 (Docket No. 44).  PPG then refers the Court to the 1964 GIP, which does not appear to be the first GIP applicable to the Natrium Plant either.  See PPG's Memorandum in Opposition to the Chemical Workers' Motion for Summary Judgment, p. 26 (Docket No. 48).  Indeed, although the relevant provision appears identical to that in the 1964 GIP, it appears that the

26

first GIP to provide for retirement benefits is the 1961 GIP, <u>see</u>
PPG Exh. 25: Abernathy Aff. ¶ 15, which provides that:

> RETIRED EMPLOYEES
> HOSPITAL, SURGICAL AND
> MEDICAL EXPENSES BENEFITS FOR
> RETIRED EMPLOYEES AND THEIR SPOUSE
>
> An employee who ceases active work because
> of retirement under the Pension Agreement and
> dependent spouse will be entitled to the
> following benefits: ....

PPG Exh. 6: 1961 GIP, p. 26.  It therefore appears, contrary to
the Union's assertion, that the "will continue" language does not
appear in the first GIP and, thus, the facts of this case appear
identical to those in <u>Skinner</u>, thereby precluding a finding that
an ambiguity exists in the Natrium Plant plan documents.

Moreover, we note that the import of <u>Skinner</u>'s findings
in this regard, as the Union itself has argued, is that the
contract must be viewed as a whole and the phrase "will continue"
must be read in context rather than in a vacuum.  Here, viewing
the CBA as a whole, it is undisputed that it contains a
durational clause limiting PPG's obligation with respect to
benefits to the term of the contract.  It would therefore appear
that when read in context any language indicating that benefits
"will continue" can be read only to suggest that benefits will
continue for the duration of the CBA.

Indeed, it appears significant that in addressing this
issue, the Court in <u>Skinner</u> cites to <u>Senn v. United Dominion
Industries, Inc.</u>, 951 F.2d 806, 816 (7th Cir. 1992), <u>cert.
denied</u>, 509 U.S. 903 (1993), in which the first CBA entered into

27

between the parties also contained "will continue" language in the provisions providing for insurance benefits for retired employees.  <u>Id.</u> at 808.  The Court nevertheless found that "it requires more than a statement in a CBA that welfare benefits 'will continue' to create an ambiguity about vesting, for the logical interpretation under our rule is that benefits 'will continue' for the duration of the contract."  <u>Id.</u> at 816.  Thus, even if the first CBA at issue in this case contained the "will continue" language it would not serve to create an ambiguity or negate the fact that under <u>Skinner</u> there must be clear and express language to overcome the presumption against vesting, which is clearly absent here.

In another attempt to convince the Court that an ambiguity exists in this case and that <u>Skinner</u> is somehow distinguishable, the Union points to the fact that the <u>Skinner</u> Court found, at least in part, that the "will continue" language was unambiguous because it applied to benefits for both active and retired employees and that because benefits for active employees cannot vest, it followed that they did not vest for the retired employees either.  The Union then argues that because the "will continued" language in the GIPs in effect when the Union participants retired in this case only applied to retirees <u>Skinner</u> is somehow inapplicable and compels a finding that an ambiguity exists.

We note at the outset that to support its argument the Union has referred the Court to page 20 of Exhibit C2 submitted

in support of Mr. Potts' Affidavit (Docket No. 12), which appears to be the 1987 Natrium GIP.  The provision on that page, however, deals with when dependents insurance begins and nevertheless appears to apply to both active and retired employees.

Further, although not entirely clear since the parties have only submitted selected pages of the relevant plan documents, it appears that, unlike in <u>Skinner</u>, the retiree benefits and those for active employees are set forth in separate sections.  <u>See</u> PPG Exh. 6: 1961 GIP, p. 26.  Thus, the fact that the "will continue" language appears to apply only to retiree benefits in a section pertaining only to retirees appears unremarkable.  Moreover, as previously discussed, because some benefits terminated upon retirement, the fact that others would continue into retirement does not create an ambiguity or suggest that they were to continue in perpetuity.  This appears particularly true in light of the duration clause contained in the GIPs.  Under these circumstances, the phrase "will continue" does not appear to be ambiguous and does not provide the basis for ignoring the duration clauses evident in the Natrium GIPs.

Finally, the Union argues that PPG's failure to include a "reservation of rights" provision in any of the GIPs evidences that PPG knew it did not have the right to modify benefits.  The Union, however, has cited no authority for its position or any that would support a finding that a reservation of rights clause must be included in order to express the intent that benefits were not to vest.  Perhaps the Union has not done so in light of

29

_Skinner_, which demonstrates that under the law of this circuit a duration clause alone can effectively minimize an employer's obligation to provide retiree welfare benefits.

Moreover, as argued by PPG, a reservation of rights clause and durational language serve two different purposes. While the former permits an employer to modify or terminate benefits at any time, a durational clause precludes an employer from doing so as long as the CBA is in effect. Thus, the absence of a reservation of rights clause in the Natrium GIPs merely prevented PPG from modifying or terminating any benefits while the relevant CBA was still in effect and does not, as the Union would have us find, undermine the duration clause or demonstrate an ambiguity in the plan documents.[7]

---

[7]     We decline to alter our findings here based on the Union's Notice of New Authority filed on September 29, 2005.  Not only is the case upon which it relies an unpublished case from the District of Arizona but its cursory finding that "contrary inferences as to intent are possible" on the limited facts developed is of little help. _ASARCO v. United Steel Workers of America_, 2005 U.S. Dist. LEXIS 20873 *9 (D. Az. July 26, 2005). Moreover, to the extent that the Court found the language in the CBA ambiguous because it provided that benefits "shall continue," it appears contrary to the Third Circuit's finding in _Skinner_.  Further, with respect to the reservation of rights ("ROR") issue, the CBA in that case contained a clause stating that "health benefits provided are 'subject to the rules and regulations of the Plan not in conflict with [the CBA].'" _Id._ at * 12.  Because the CBA provided for what could be vested benefits, the Court found that the ROR in the SPDs, which was not bargained for, was subordinate to the CBA and could not affect what could be contractually vested or bargained for rights.  Not only are the facts in our case distinguishable with respect to
(continued...)

30

It therefore appears that the plan documents pertaining to the Natrium Plant are not only devoid of clear and express language indicating PPG's intent to vest retiree welfare benefits, but they are without ambiguity, thereby precluding a finding that PPG intended for retiree medical benefits to vest.[8]

---

[7]      (...continued)
language and documents but it does not appear that the question of whether the defendants acquiesced to the inclusion of the ROR or whether they waived their right to object to its insertion was addressed by the Court. Having found that the Union, in fact, waived its right to object to the duration clause at issue here, ASARCO does not appear to compel a different result.

[8]      Having so found, we reiterate here that it is the plan documents that control and which the Court must assess to determine whether the right to lifetime benefits has been established. Unisys, 58 F.3d at 902. While we are mindful of the fact that extrinsic evidence may be used to determine whether an ambiguity exists in a plan document, it may not be used to create an ambiguity where none exists. See Skinner, 188 F.3d at 145. Indeed, quoting from Bidlack v. Wheelabrator Corp., 993 F.2d at 608, the Court in Skinner opined that before extrinsic evidence should be considered, "there must be either contractual language on which to hang the label of ambiguous or some yawning void ... that cries out for an implied term. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them." Skinner, 188 F.3d at 146. Because it appears that no ambiguity exists in the plan documents at issue here we have not considered the extrinsic evidence submitted by the Union. It should nevertheless be noted that the evidence submitted by the Union consists largely of documents other than plan documents and testimony from Union officials that benefits were meant to vest or statements allegedly made to them by PPG representatives to the same effect. The Court of Appeals for the Third Circuit has held, however, that neither testimonies of union members as to their belief
(continued...)

As such, the grievance which the Union seeks to arbitrate cannot be said to arise under the contract and, thus, PPG cannot be compelled to arbitrate under the expired CBAs. Litton, supra.

For these reasons, it is recommended that defendant's motion for summary judgment pertaining to plaintiff's claims regarding defendant's Martinsville, West Virginia Plant (Docket No. 35) be granted, and that plaintiff's refiled motion for summary judgment (Docket No. 12) be denied.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/ Amy Reynolds Hay
AMY REYNOLDS HAY
United States Magistrate Judge

Dated:     30 September, 2005.

---

[8]          (...continued)
          regarding the duration of retirement benefits nor
          an employer's oral undertakings serve to modify
          the written terms contained in plan documents
          that are otherwise complete. Skinner, 188 F.3d
          at 145-147. See Depenbrock v. CIGNA Corp., 389
          F.3d 78, 81-82 (3d Cir. 2004)(ERISA requires that
          all employee benefit plans be established and
          maintained pursuant to a written instrument and
          precludes oral or informal amendments.) It
          therefore appears that even if the Court were to
          consider the Union's extrinsic evidence it would
          not compel a different result.

cc:  Hon. David S. Cercone
     United States District Judge

     Michael J. Healey, Esquire
     Healey & Hornack
     Law & Finance Building, Fifth Floor
     Pittsburgh, PA 15219

     Sally M. Tedrow, Esquire
     O'Donoughe & O'Donoughe
     4748 Wisconsin Avenue, NW
     Washington, DC 20016

     Richard J. Antonelli, Esquire
     Spilman Thomas & Battle, PLLC
     One Oxford Centre, Suite 3440
     301 Grant Street
     Pittsburgh, PA 15219

     Melvin P. Stein, Esquire
     United Steel Workers of America
     Five Gateway Center
     Room 807
     Pittsburgh, PA 15222

     William T. Payne, Esquire
     Schwartz. Steinsapir, Dohrmann & Sommers
     1007 Mt. Royal Boulevard
     Pittsburgh, PA 15223

     John E. Stember, Esquire
     Edward J. Feinstein, Esquire
     Pamina Ewing, Esquire
     Stephen M. Pincus, Esquire
     Stember Feinstein Krakoff
     429 Forbes Avenue
     1705 Allegheny Building
     Pittsburgh, PA 15219